IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANDRE LORENZANO                :        CIVIL ACTION
                               :
          v.                   :
                               :
UNIT MANAGER LINK, et al.      :        No. 11-3551


MEMORANDUM

McLaughlin, J.                          November 7, 2014

          Andre Lorenzano, the plaintiff in this civil rights

action, is a former inmate at State Correctional Institution

("SCI") Graterford who is serving a state prison sentence in the

Pennsylvania Department of Corrections ("DOC").[1]  The defendants

are SCI Graterford Unit Manager Cynthia Link and Lt. Lorie

Eason.[2]  Lorenzano filed suit under 42 U.S.C. § 1983, claiming

that Link and Eason violated his Eighth Amendment right to be

free from cruel and unusual punishment by failing to protect him

from his cellmate, Mark Galloway.[3]

---

[1]     Lorenzano is currently proceeding pro se.  The Court
previously appointed counsel for Lorenzano, but counsel withdrew
because of a conflict.  The Court then asked Lorenzano if he
wished to continue waiting for an attorney, or if he wanted to
proceed with the case pro se.  Lorenzano chose to proceed with
his case pro se.

[2]     Link is now a DOC Major and Eason is now a DOC Captain.  To
avoid confusion, the Court will use the titles held by the
defendants at the time of the events in question.

[3]     Lorenzano also filed other claims against Eason and Link,
as well as claims against David DiGuglielmo, A. Scott
Williamson, and Grievance Coordinator Wendy Shaylor.  Lorenzano
consented to the dismissal of all claims against Shaylor, as

The parties have filed cross-motions for summary judgment.  In his motion and his many supplemental filings with the Court, Lorenzano argues that he informed Link and Eason of the risk posed by Galloway and that they took no actions to protect him from that harm.[4]  Link and Eason argue that they did not have knowledge of any substantial risk of harm to Lorenzano.  Alternatively, they argue that they are shielded from suit by qualified immunity because the constitutional right at issue was not clearly established.  The Court will deny both motions for summary judgment because there are disputed issues of material fact.[5]

---

well as all other claims against Link and Eason.  No affidavit of service has been filed for DiGuglielmo or Williamson, who Link and Eason state are retired DOC officials.

[4]    In his filings, Lorenzano concentrates mainly on showing that the prison's responses to the grievances and appeals he filed following the incident between himself and Galloway were inaccurate.  The focus of the Eighth Amendment inquiry is on the events preceding the incident between Lorenzano and Galloway, not the grievance proceedings that followed.  Many of Lorenzano's arguments are therefore not relevant to the analysis of the pending motions.

[5]    Because the case will proceed to trial, the Court will order it back on the Prisoner Civil Rights Panel website in an attempt to procure counsel for Lorenzano.

I.   <u>Summary Judgment Record</u>[6]

Lorenzano began his period of DOC custody in May 2009, when he arrived at SCI Pittsburgh.  After a series of transfers, Lorenzano arrived at SCI Graterford on August 3, 2009.  Lorenzano Dep. 9:15-11:9.

At the time of the events in question, Link was the "A" Unit Manager assigned to Housing Unit D at SCI Graterford ("D-Block").  Link's job duties included determining the cell assignments of the inmates on D-Block.  In making cell assignments, Link considered the inmates' size, age, known dispositions, custody levels, program codes, criminal charges, misconduct history, and sexual predator status.  Link Decl. ¶¶ 2, 4, 11, 16.

Eason was the 6:00 a.m. through 2:00 p.m. Lieutenant for D-Block at SCI Graterford.  Eason was not authorized to unilaterally change an inmate's cell assignment within the block, but could transfer an inmate from D-Block to the Restricted Housing Unit ("RHU") if she had reason to believe the inmate was in danger and could not be protected by alternate measures.  Eason Decl. ¶¶ 2, 7-8.

---

[6]   On a motion for summary judgment, the Court considers the evidence in the light most favorable to the non-moving party. <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1866 (2014).  Thus, when considering Lorenzano's motion, the court considers the evidence in the light most favorable to Link and Eason, and vice-versa. Unless otherwise noted, the facts set forward herein are undisputed.

When he arrived at SCI Graterford, Lorenzano was
initially assigned to the RHU.  On October 19, 2009, Lorenzano
was moved from the RHU to D-Block.  Lorenzano Dep. 12:25-13:3,
19:7-10.

Link assigned Lorenzano to a double cell which already
housed inmate Anthony Jones.  Within a few weeks, Jones was
reassigned and another inmate, Bradley Maines, moved into
Lorenzano's cell.  On December 4, 2009, Maines was moved to
another cell.  Lorenzano never had issues with either Jones or
Maines, and thus never reported any issues with those cellmates
to prison authorities.  Link Decl. ¶ 23; Lorenzano Dep. 22:19-
21, 41:15-45:8.

On December 7, 2009, Link assigned inmate Mark
Galloway to Lorenzano's cell.  Galloway was similar in size and
age to Lorenzano, had the same custody level as Lorenzano, and
had no known problems with cellmates.  Link Decl. ¶¶ 32-34;
Lorenzano Dep. 47:20-24.

Soon after Galloway moved into Lorenzano's cell,
tensions arose between the cellmates.  Lorenzano took issue with
several aspects of Galloway's behavior in their cell.  Galloway
would get up in the middle of the night to brush his teeth,
rocking Lorenzano's bunk in the process.  Galloway often stood
over top of Lorenzano when he would watch TV, putting his groin
in Lorenzano's face.  Galloway would also "holler out the door,"

4

and would not wipe off the toilet after urinating on it.
Lorenzano Dep. 51:13-55:11.

Galloway also initiated unwanted physical contact with
Lorenzano.  For example, he would sometimes sit on a crate and
lean back onto Lorenzano's bed, touching Lorenzano's leg in the
process.  He also sometimes rubbed his elbow on Lorenzano's leg.
On at least one occasion, Galloway grabbed Lorenzano.  Galloway
also screamed at Lorenzano, and the two cellmates often argued
about their living situation.  Lorenzano Dep. 54:24-56:18,
77:13-78:4.

Lorenzano reported his concerns to Link and Eason
"every chance [he] got."  He repeatedly asked to switch cells or
be assigned a new cellmate.  He told Link and Eason that he was
afraid "something might happen in that cell and I don't want do
[sic] get in no trouble," that "the dude might do something,"
and that he thought he and Galloway were "going to get into an
incident."  It is disputed whether Lorenzano explicitly told
Link and Eason that he feared Galloway was going to harm him.
At his deposition, Lorenzano was asked:

> Q: Would you say that every time, I fear for
> my safety, I'm afraid he's going to hurt me?
>
> A: Yes.

Lorenzano Dep. 54:1-58:21.  In their declarations, Link and
Eason stated that although Lorenzano did complain to them about

Galloway, he never said he feared Galloway would harm him.   Link
Decl. ¶¶ 35-36; Eason Decl. ¶¶ 16-18, 22-29.

On December 31, 2009, Lorenzano talked to Eason again
about his concerns with Galloway and his desire to be removed
from the cell with Galloway.   Eason told him that his Z-Code
status[7] would be resolved soon and that he would therefore be
removed to a single cell.   She also told him that she couldn't
move him because Link was not present at that time.   Lorenzano
had a similar conversation with Eason on January 3, 2010.   Link
was off from work and was not present at the prison from
December 31, 2009-January 3, 2010.   Lorenzano Dep. 62:2-63:16,
94:5-95:2; Link Decl. ¶ 42.

Eason never offered to transfer Lorenzano to the RHU
for his protection, nor did Lorenzano request a transfer to the
RHU.   Lorenzano stated that he did not ask for such a transfer
because there were empty cells on D-Block that he could be
transferred to.   Link stated in her declaration that D-Block was

---

[7]     Z-Code status is assigned to certain inmates after review
of the inmate by a team of staff from the prison.   It can be
assigned to inmates for a variety of reasons, including mental
health.   A prisoner with Z-Code status must be in a single cell
– that is, cannot have a cellmate.   At the time Galloway moved
into Lorenzano's cell, Lorenzano was under consideration for Z-
Code status.   In mid- to late-January, 2010, Lorenzano was
approved for Z-Code status and was therefore provided a single
cell.   Link Decl. ¶ 13; Lorenzano Dep. 24:21-25:14, 112:4-
114:23.

filled to capacity at the time of the events in question. Lorenzano Dep. 58:25-59:6, 80:22-83:24; Link Decl. ¶ 4.

After speaking with Eason on January 3, 2010, Lorenzano returned to his cell and laid down on his bunk. Suddenly, Galloway grabbed Lorenzano and pulled him from the bunk. Galloway hit Lorenzano's head against the metal part of the bunk, against the corner of a table, and finally against the floor. Lorenzano screamed for help, and a guard got Eason, who let Lorenzano out of the cell. Lorenzano was then sent to the medical unit so his injuries could be treated. After going to medical, Lorenzano was placed in the RHU. Lorenzano Dep. 99:3-102:16.

As a result of the assault by Galloway, Lorenzano suffered nerve damage to his right eye that resulted in partial vision loss, suffers from migraine headaches, suffers from nose bleeds and dizziness, and has been diagnosed with post-concussion syndrome. Lorenzano Dep. 126:9-130:7.

II. Summary Judgment Standard

Under Fed. R. Civ. P. 56, a party moving for summary judgment must show that there is no genuine issue as to any material fact and that judgment is appropriate as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of any genuine issue of

material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323
(1986).  Once a properly supported motion for summary judgment
is made, the burden shifts to the nonmoving party, who must set
forth specific facts showing that there is a genuine issue for
trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250
(1986).  The mere existence of some alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment.  Id. at 247-48.


III. Discussion

        Link and Eason have moved for summary judgment on both
the Eighth Amendment issue and on the basis of qualified
immunity.  The motion will be denied as to both issues.
Lorenzano's motion for summary judgment will also be denied.


    A.    Eighth Amendment Violation

        To recover under 42 U.S.C. § 1983, a plaintiff must
show the violation of a right secured by the Constitution and
laws of the United States, and must show that the alleged
deprivation was committed by a person acting under color of
state law.  West v. Atkins, 487 U.S. 42, 48 (1988).  There is no
dispute that Link and Eason were acting under color of state law
at the time of the claimed Eighth Amendment violation; indeed,
both were working as state prison officials.  The focus of the

8

analysis is therefore whether Lorenzano has put forward facts
sufficient to show a violation of his Eighth Amendment rights.

The Eighth Amendment's prohibition of "cruel and
unusual punishments" imposes a duty on prison officials to
"protect prisoners from violence at the hands of other
prisoners." Farmer v. Brennan, 511 U.S. 825, 832-33 (1994)
(internal quotation marks omitted).  Not every injury suffered
by one prisoner at the hands of another creates constitutional
liability for prison officials responsible for the victim's
safety, however.  Id. at 834.  To recover under an Eighth
Amendment failure-to-protect theory, a prisoner must show:  (1)
that he is incarcerated under conditions posing a substantial
risk of serious harm; and (2) that the prison officials were
deliberately indifferent to this substantial risk.  Id.
Additionally, the officials' deliberate indifference must have
caused harm to the prisoner.  Bistrian v. Levi, 696 F.3d 352,
367 (3d Cir. 2012).


### 1.   Substantial Risk of Serious Harm

A prisoner satisfies the first element of the test
when the alleged "punishment" is "objectively sufficiently
serious."  Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997)
(quoting Farmer, 511 U.S. at 834).  The focus of this objective
inquiry should not be "the extent of the physical injuries

9

sustained in the attack, but rather the existence of a substantial risk of serious harm." Pearson v. Vaughn, 102 F. Supp. 2d 282, 290 (E.D. Pa. 2000) (quoting Thomas v. Vaughn, 1998 WL 647270, at *5 (E.D. Pa. Sept. 21, 1998)).  A substantial risk of serious harm "'may be established by much less than proof of a reign of violence and terror,' but requires more than a single incident or isolated incidents." Blanchard v. Gallick, 448 F.App'x 173, 177 (3d Cir. 2011) (quoting Riley v. Jeffes, 777 F.2d 143, 147 (3d Cir. 1985)).

     The presence of Galloway as Lorenzano's cellmate created a substantial risk of serious harm to Lorenzano.  The two had arguments about their living situation, and Galloway initiated unwanted physical contact with Lorenzano.  On at least one occasion, Galloway grabbed Lorenzano.  Additionally, Lorenzano made multiple complaints to Link and Eason that he wanted to be removed from the cell with Galloway because he thought "something might happen," that Galloway "might do something," and that he and Galloway were going to "get into an incident."  There is also a dispute over whether Lorenzano explicitly told Link and Eason that he was afraid Galloway would hurt him.

     The pattern of abnormal behavior exhibited by Galloway, the tension between the two cellmates, and the increasingly aggressive physical contact initiated by Galloway

show that a substantial risk of serious harm to Lorenzano existed as long as he shared a cell with Galloway.

Link and Eason argue that the fact that Lorenzano never requested to be placed in the RHU for his own safety "discredits" his assertion that Galloway posed a substantial risk of serious harm. Although this evidence may weigh against finding that Galloway posed a risk of harm to Lorenzano, a reasonable finder-of-fact may credit Lorenzano's explanation that he didn't request to be placed in the RHU because there were open cells in D-Block to which he could have been transferred. This argument at most creates a disputed issue of material fact, which would preclude granting the motions for summary judgment.

### 2.   Deliberate Indifference

The second element of the test, deliberate indifference, is a subjective standard. Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001) (citing Farmer, 511 U.S. at 834). To be liable, the prison official "'must actually have known or been aware of the excessive risk to inmate safety.' It is not sufficient that the official should have known of the risk." Bistrian, 696 F.3d at 367 (quoting Beers-Capitol, 256 F.3d at 125). If a prison official knew of a substantial risk of serious harm to a prisoner and failed to

respond reasonably, the official was deliberately indifferent. Bistrian, 696 F.3d at 367-68.

A plaintiff can prove an official's actual knowledge of a substantial risk through circumstantial evidence; "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842. For example, if "the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence would be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." Id. at 842-43.

In their declarations, Eason and Link state that they were *not* aware of any risk facing Lorenzano. They also state that complaints like Lorenzano's are commonplace and do not typically escalate into violence. Link Decl. ¶¶ 34-41; Eason Decl. ¶¶ 19, 24-29.

On the other hand, Lorenzano frequently complained about Galloway, and told Eason and Link that "something might happen" between them, that Galloway "might do something," and that they were going to "get into an incident." Lorenzano also told Eason and Link that Galloway initiated unwanted physical contact with Lorenzano, including at least one instance in which Galloway grabbed Lorenzano. Finally, it is disputed whether

Lorenzano explicitly told Eason and Link that he was afraid of being harmed by Galloway.

There is conflicting evidence on the issue of Link and Eason's knowledge of the risk facing Lorenzano.  If the finder-of-fact finds that, in addition to his other complaints, Lorenzano explicitly told Link and Eason of his fear of harm from Galloway, it could infer that Link and Eason "must have known" of the risk.  Farmer, 511 U.S. at 842-43.  In Jones v. Beard, 145 F.App'x 743, 745 (3d Cir. 2005), the Third Circuit held that prison guards did not have actual knowledge of a threat of serious harm to an inmate in part because the inmate had not "articulated specific threats of harm."  See also Blackstone v. Thompson, 568 F.App'x 82, 84-85 (3d Cir. 2014); Bizzell v. Tennis, 449 F.App'x 112, 115 (3d Cir. 2011).  In this case, the finder-of-fact could decide that Lorenzano "articulated specific threats of harm" to Link and Eason, and that Link and Eason had subjective knowledge of the risk facing Lorenzano.

The finder-of-fact could, on the other hand, believe Link and Eason's statements that they had no knowledge of the risk.  There are therefore disputes over material facts which preclude any grant of summary judgment.

B.   <u>Qualified Immunity</u>

There are two prongs to the qualified immunity analysis:  (1) whether a plaintiff has shown facts that make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of a defendant's alleged misconduct.  <u>Pearson v. Callahan</u>, 555 U.S. 223, 232 (2009).  It is left to a court's discretion which of the two prongs to address first in light of the circumstances in the particular case at hand.  <u>Id.</u> at 236.

As discussed above, Lorenzano has produced sufficient evidence for a finder-of-fact to determine that Link and Eason violated Lorenzano's Eighth Amendment right to be free from cruel and unusual punishment under a failure-to-protect theory.  Lorenzano has therefore overcome the first prong of the qualified immunity analysis.

For a right to be "clearly established" for purposes of qualified immunity, the

> contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

<u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987) (internal citations omitted).

14

In <u>Farmer</u>, 511 U.S. at 832-47, which was decided in 1994, the Supreme Court set forth the prevailing deliberate indifference standard for Eighth Amendment failure-to-protect claims.  The events in this case took place in late-2009 and early-2010, long after <u>Farmer</u> established the right at issue.  Furthermore, there is no novel legal question at issue in this case, nor are there any circuit splits on relevant questions of law.  <u>See</u> <u>Ray v. Township of Warren</u>, 626 F.3d 170, 177 (3d Cir. 2010) (holding that a right was not clearly established due to a lack of a precedential Third Circuit holding and the presence of a circuit split on the issue).  Based on <u>Farmer</u>, a reasonable prison official would understand that knowingly disregarding a substantial risk of serious harm to an inmate would be a violation of the Eighth Amendment.  The right at issue was therefore clearly established at the time of the defendants' alleged misconduct.

Link and Eason argue that they took no immediate action because they did not consider Galloway's presence in Lorenzano's cell an immediate risk of harm to Lorenzano, and that this determination was reasonable.  This seems to be an argument that goes to the merits of the Eighth Amendment claim rather than an argument about whether the right was clearly established.  As stated above, there are disputes over material

facts that prevent summary judgment on the merits of the

failure-to-protect claim.


            An appropriate order shall issue.